AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Verizon Wireless account associated with telephone<br>number 213-408-2461 (Subject Account 2) | )<br>)<br>)<br>)<br>)    Case No.    **23mj1490**<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the _____ District of _____ New Jersey _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18, USC sec. 1591 | Sex Trafficking by Force, Fraud, and Coercion |
| 18, USC sec. 2422 | Coercion and Enticement of a Minor to Engage in Prostitution |

The application is based on these facts:

See Attached Affidavit of HSI Special Agent Aron Marcellus, incorporated herein by reference.

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Special Agent Aron Marcellus, HSI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 04/25/2023 _____

City and state:   San Diego, California

*William V. Gallo*
_____
*Judge's signature*

Hon. William V. Gallo, U.S. Magistrate Judge
_____
*Printed name and title*

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT

I, Aron Marcellus, being duly sworn, state as follows:

1.     This affidavit is in support of an application by the United States of America for a search warrant for T-Mobile, as described in Attachment A-1, and Verizon Wireless, as described in Attachment A-2, to search the account associated with the following cellular telephone numbers:

**Phone #** 442-340-5961 (**Subject Account 1**), serviced by T-Mobile

**Phone #** 213-408-2461 (**Subject Account 2**), serviced by Verizon Wireless

(the "subject accounts") for subscriber information, telephone toll data, and cell-site geolocation data from April 5, 2023 through April 10, 2023. There is probable cause that these records and information constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 18, United States Code Sections 1591 and 2422, as described in Attachments B-1 and B-2.  This affidavit and these applications are sought pursuant to Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 2703(a), which applies to providers of electronic communication services.  In this case, as will be shown below, T-Mobile and Verizon Wireless provide electronic communication services in the form of cellular and wireless telephone service for the subject accounts.

## EXPERIENCE & TRAINING

2.     I am a Special Agent with Homeland Security Investigations.  I have been employed as a special agent since September 2017 and am an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7).

3.     I have been trained to conduct criminal investigations for multiple violations of federal and state laws including, but not limited to alien smuggling and narcotics smuggling, human trafficking, weapons trafficking, and organized criminal activity.  I am currently assigned to the Border Enforcement Security Task Force (BEST), Human Smuggling/Trafficking Group specializing in a variety of criminal and

financial investigations. My primary responsibilities include investigating human smuggling/ trafficking and narcotics violations.  These investigations include, but are not limited to, investigations involving wire fraud, money laundering, financial crimes and bulk cash smuggling.

4.     Prior to being a SA with HSI, I was a Supervisory U.S. Border Patrol Agent (SBPA) with U.S. Customs and Border Protection (CBP) from April 2017 to September 2017 and a U.S. Border Patrol Agent (BPA) from February 2008 to March 2017.  As a BPA I conducted law enforcement field operations, interviews, made arrests and prepared administrative and criminal cases related to the violation of immigration and narcotics laws.

5.     Since October 2019, I have been assigned to the SDHTTF where I have participated in investigations involving the exploitation of children and adults for illicit commercial sex activity, human trafficking, forced labor, various illegal activity of criminal gang members and have performed a variety of related investigative tasks.

6.     My experience as an HSI Special Agent has included the investigation of cases involving the use of computers and the internet to commit crimes. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence seizure and processing, and various other criminal laws and procedures. I have personally participated in the execution of search warrants involving the search and seizure of third-party records.

7.     Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a.     Individuals involved in illicit commercial sex often solicit clients through electronic advertisements and other media, such as Craigslist, MegaPersonals, Skipthegames, and other social media sites accessed on cellular telephones and computers.

b.      Individuals involved in illicit commercial sex use cellular telephones, tablet, desktop, removal hard drives and flash drives, and notebook computers and maintain these items on their person and/or in their residences and/or vehicles. Individuals involved in illicit commercial sex use cellular telephones, tablet, notebook computers, and removable storage media to increase their mobility, coordinate illicit activities, and to provide pimps and prostitutes with instant access to phone calls, voice messages, text messages, instant messaging (IM) and internet based correspondence. Individuals involved in illicit commercial sex will use multiple cellphones, tablets, notebook computers, and phone numbers in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients. Individuals involved in illicit commercial sex also utilize digital cameras, cellular telephones, desktop and notebook computers with photograph and video capabilities to take photographs and videos of themselves as well as other coconspirators for the purpose of electronic advertising and promotion of prostitution.

c.      Individuals involved in illicit commercial sex use social media sites like Facebook or Instagram to find clients and prostitutes. They use Facebook messaging applications to communicate with prostitutes and customers to increase their mobility and coordinate illicit activities. Individuals involved in illicit commercial sex will often use multiple social media accounts in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients. These social media accounts contain electronic data concerning instant messaging, electronic mail and social media addresses of co-conspirators and clients, including contact information for co-conspirators and clients. Individuals involved in illicit commercial sex also utilize social media to store and display, commonly known as posting, photographs, videos, and text of themselves as well as other co-conspirators for the purpose of electronic advertising and promotion of prostitution.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-3-

d.    11.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, the evidence of illegal activity described above in paragraphs "a" through "g" is maintained in third party records of accounts utilized by individuals involved in illicit commercial sex.

8.    The facts and conclusions set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation; my review of documents and records related to this investigation; communications with others who have personal knowledge of the events, details, and circumstances described herein; and information gained through my training, experience, and communications with colleagues.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.  Dates, times, and amounts are approximate.

## STATEMENT OF PROBABLE CAUSE

9.    On Sunday, April 9th, 2023, at approximately 1300 hours, San Diego Police Department Officers responded to a report of a robbery at 3792 4th Avenue, in the city and county of San Diego. This location is a 7-Eleven Store. The radio call stated a female was hit by a vehicle and her phone was stolen. Upon arrival, officers contacted the 16 year-old victim, JF. JF told the officers, in essence, that a male subject known to her as "Deondre" (later identified as Deondre Demetris PORTER ("PORTER")) and an adult female physically assaulted her, strangled her, prevented her from leaving, and ultimately stole one of JF's cellphones out of her hand. PORTER and the adult female left the scene. JF gave a physical description of PORTER and the adult female. JF also reported that PORTER is known to her as "Count Up" and the adult female goes by "Kash". JF told the officers that PORTER's Instagram account is "2130_Countup" and his phone number is 442-340-5961. JF stated the adult female's phone number is 213-

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

408-2461. JF showed officers a photo on her phone of her standing in front of PORTER's vehicle, a white BMW bearing CA/9DOC085. A records check of the license plate revealed the vehicle is registered to Deondre Demetris PORTER. Due to the extent of JF's injuries observed at the scene, to include, bruising and abrasions to her left knee, right eyebrow, right leg, and right shoulder, as well as redness around her eyes and neck. She was transported by ambulance to the emergency department at UCSD Hillcrest where she was admitted for emergency care.

10.     Two witnesses were interviewed. L█ F█ reported seeing a white BMW quickly leave the area and JF laying on the ground. She believed JF had been hit by the white BMW. JF told L.F. that she was 16 years old and a trafficking victim. M█ F█ reported seeing JF either jumping or being thrown out the rear driver's side seat of a white BMW, with her belongings. JF's top was pulled down exposing her breasts.

11.     Based on this information, officers contacted the San Diego Human Trafficking Task Force for further investigation.

12.     On April 9th, at about 1530 hours, SDPD/SDHTTF Task Force Officers (TFO) arrived at UCSD Hospital – Hillcrest and interviewed JF. The following is a synopsis of JF's statement and has been edited for clarity and brevity and is not a verbatim account.

STATEMENT OF JF

13.     JF began communicating with PORTER on Instagram (via her account "█████████ and PORTER's account "2130_countup") approximately three days ago and planned to meet. She believed the intent was to "drink and smoke" and did not initially believe him to be a trafficker. PORTER picked JF up from the hotel in which she was staying with another friend and drove her to an unknown hotel in Victorville. At this hotel, she met two adult females. One of the females left shortly after JF's arrival. The other female JF identified as "Kash" or "Aliyah." JF did not know this person's true identity and referred to her as Kash throughout the interview. JF also

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

referred to Kash as PORTER's bottom.[1] JF stated Kash is a Black female, slim, tall, and wearing a wig. JF stated Kash has butterfly tattoos on her neck and hands. JF recalled Kash pinching her out of jealousy after getting to the hotel in Victorville.

14.     JF stated that once at the hotel in Victorville it became clear that PORTER is a trafficker as he began telling JF his rules[2] in person. JF recalled his rules included that she had to "work all day everyday" and had a $1500 quota each night/using ten condoms[3]. If she didn't make quota, JF stated "he would get to beating my ass but he wouldn't beat the other bitch up and she wouldn't make no money." She also explained that all of her earnings from commercial sex would be collected by PORTER and he would spend JF's money on Kash. JF estimated giving PORTER over $1,000. PORTER told JF that if she wanted to leave she would have to pay an exit fee[4] of $5,000 and give him both of her phones. JF stated PORTER required her to be advertised for commercial sex on websites such as Private Delights and MegaPersonals.[5] JF described PORTER setting up a MegaPersonals account for her by having JF pose for a photo with the ID

---

[1] Based on my training and experience, I know the term bottom to refer to a prostituted person under the control of a trafficker who handles much of the enforcement and day to day dealings within the pimping and prostitution subculture. The bottom is often used to shield the trafficker from legal troubles. The trafficker also utilizes the bottom role to pit the prostitutes under their control against one another, vying for that position, as it often means a reduced amount of commercial sex acts they have to perform.
[2] Based on my training and experience, I know the term rules to commonly refer to a set of expectations a pimp or trafficker has for a prostitute under their control.
[3] Based on my training and experience, I know the term quota to refer to a trafficker's expectation of how much money a person under their control is required to make before they can stop engaging in commercial sex for that time period. This may be a dollar amount or an amount of condoms used.
[4] Based on my training and experience, I know the term exit fee to refer to an amount of money a prostituted person is required to pay to be able to leave their trafficker; this amount is usually an unobtainable amount.
[5] Based on my training and experience, I know these websites primary usage is for the advertising of commercial sex.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-6-

1  of Kash or another girl[6] and then posting photos of JF in the advertisements. JF believed

2  the setup of the account and posting of advertisements occurred using Kash's trap

3  phone.[7] JF stated that PORTER would communicate with the sex buyers responding to

4  JF's ads and direct JF's commercial sex activity both in San Bernardino and San Diego

5  using his phone. She stated she observed PORTER to be the only person to use his

6  phone; she did not see anyone else other than PORTER using his phone. JF stated she

7  told PORTER she was 16 years old, and he did not care. JF stated PORTER told Kash

8  that JF was 16 years old. JF stated that PORTER asked to have sex with her, but she

9  told him that due to being on her menstrual cycle she could not.

10        15.     JF stated she, PORTER, and Kash initially left Victorville to go to G Street

11  in San Bernardino[8]. However, when PORTER learned JF had contacts in San

12  Bernardino he decided it would be better to travel to San Diego instead to further isolate

13  JF. Once in San Diego, JF stated they checked into a hotel room at a Motel 6 and stayed

14  for one night. JF looked at a map and believed she was at the Motel 6 Downtown San

15  Diego located at 1546 2nd Avenue in the city of San Diego. JF recognized a picture of

16  the hotel, specifically the windows and parking lot. JF did not know who booked the

17  room and could not remember in what room they stayed. JF stated that she was required

18  to do incall, outcall, and car date[9]   commercial sex encounters from online

19

20  _____

21  [6] Based on my training and experience, I know MegaPersonals requires users to take a
photo with an ID showing they are an adult as age verification in order to make an

22  account to post commercial sex ads. For minors this is often defeated by using a similar
enough looking person's ID, such as in this case, or other means such as buying an

23  already active account or having an adult create the account themselves.

24  [7] Based on my training and experience, I know a trap phone in this context to refer to a
phone used for the purpose of prostitution/illegal activity.

25  [8] Based on my training and experience, I know G Street in San Bernardino to be a

26  blade/area in which street level prostitution is publicly available.

27  [9] Based on my training and experience, I know an incall to be a prostitution encounter
where the sex buyer travels to the prostituted persons location; an outcall to be where

28

advertisements and walk the blade[10] on Roosevelt Avenue.[11] While walking the blade, PORTER would be in his vehicle circling the area. When engaged in commercial sex encounters at the hotel, PORTER and Kash would wait in the hotel room bathroom. She estimated completing three $500 commercial sex encounters each day while in San Diego. JF believed she had deleted any messages she had with PORTER, per PORTER's directions.

16.     Prior to the assault, JF stated PORTER and Kash were mad at her for being "kidnapped" twice. JF stated that earlier that day she was walking the blade on Roosevelt Avenue and PORTER told her she had ten minutes to get a "date"[12], otherwise she would get "beat." JF got into a vehicle after negotiating a $200 date. JF was not able to provide specific details but alleged this person was trying to kidnap her. She was able to get away and as a result, PORTER assaulted JF. On a second occasion, JF got into a vehicle with who she believed to be a sex buyer. The subject was armed with a handgun and disclosed he planned to rob PORTER. JF was able to escape the situation once again.

17.     Following these incidents, JF was in the white BMW with PORTER and Kash. PORTER and Kash began arguing with JF and JF attempted to escape the vehicle. JF stated Kash prevented JF from exiting the vehicle by closing the door when JF would open it to escape. JF stated Kash began striking her on the face and back of her head with both open hand blows and closed fist punches. Kash then began strangling JF with

the prostituted person travels to the sex buyers locations; a car date to be a prostitution encounter that happens in a vehicle.

[10] Based on my training and experience, I know a blade, track, or stroll as a geographical area known for prostitution activity, where prostitutes gather to be solicited by those seeking to exchange sex for money.

[11] Based on my training and experience, Roosevelt Avenue is a known blade in San Diego County.

[12] Based on my training and experience, the term date commonly refers to a prostitution encounter.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-8-

both hands, feeling both of her thumbs over her airway; JF estimated the strangling to last approximately seven seconds. JF recalls "I passed out for a second." JF believed Kash had additional "animosity" towards her; but later expressed that Kash had been nice to her early in the day and then started hitting JF because her "boyfriend told her to." JF explained that, at this point, PORTER began striking the back of her head and her face with both open hand blows and closed fists. JF stated she believed the two were trying to kill her as she heard them both make statements to the effect of, "I'm going to kill you bitch" and "you're going to get killed today." JF stated she was able to exit the vehicle. JF also stated that she felt a push on her back, but also described trying to get out of the vehicle. Upon exiting, JF recalls landing on her head and being positioned on the ground towards the front of the vehicle. From this position she could see PORTER driving the vehicle and saw the vehicle drive forward with the front tire coming towards her head. Based on the actions and statements of PORTER and Kash, she believed PORTER was trying to run her over in an effort to kill her. JF was able to quickly get up off the ground and move out of the way of the vehicle; JF believed that had she not moved, she would have been hit by the vehicle driven by PORTER. JF reiterated this occurred in the 7-Eleven parking lot.

18.     JF stated that during the assault PORTER and Kash were trying to forcibly take her cellphone and strip her of her clothing. JF stated PORTER or Kash was able to take one of her cellphones, but that she was able to hold onto her other cellphone. Prior to our arrival at the hospital, JF was able to locate her stolen phone using the Find my Phone app and saw her phone was in Riverside County. However, eventually she was no longer able to track the stolen phone's location.

19.     During the interview, JF showed TFOs a photo of her standing in front of PORTER's vehicle as seen below. The vehicle in the photo, and as reported to the SDPD officers by JF, also matches the description of the vehicle given by witnesses at the scene.

1
2
3
4
5
6
7
8
9
10
11



12   20.   JF gave verbal and written consent to search the contents of her cellphone
13   and create a forensic copy of the contents.

14   21.   After obtaining JF's statement, Officer Addison provided a California
15   Driver's License photo matching the registered owner and address of the white BMW
16   for Deondre Demetris PORTER CDL# ▮▮▮▮▮ and DOB of ▮▮▮▮▮ Upon being
17   shown PORTER's driver's license photo, JF immediately recognized the person to be
18   who she knows as Deondre and "Count Up."

DIGITAL EVIDENCE

19
20   22.   A digital forensic extraction of JF's cell phone was conducted. Below are
21   descriptions of some of the relevant content found in the extraction.

22   23.   Within the messages stored in the iMessages application, there was a
23   conversation with the phone number 442-340-5961 previously reported by JF as
24   PORTER's phone number. The conversation begins on Wednesday, April 5th, 2023, as
25   seen below. In the screenshot below and left, messages can be seen where JF asks
26   PORTER if she has any requests for commercial sex. PORTER replies with a screenshot
27   of sex buyers he is communicating with for JF. In screenshot below right, the

28

1  conversation continues with PORTER directing JF to video call the sex buyer, directing
2  her how to interact with the sex buyer, and telling her how much he negotiated for the
3  commercial sex act she is to perform.

4
5
6
7   
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23  / /
24  / /
25  / /
26  / /
27  / /
28

24.    In the below messages, PORTER continues to tell JF what he expects her to charge for commercial sex acts and how to interact with sex buyers:




/ /

/ /

/ /

/ /

/ /

/ /

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

1    25.    In the below messages PORTER arranges a prostitution encounter for JF.

2  Afterward, she tells PORTER the sex buyer paid via Cash App. PORTER responds by

3  sending JF his Cash Tag for her to use to transfer her earnings to him. She responds

4  with a screenshot of her sending PORTER $224. In the screenshot of the Cash App

5  transaction, PORTER's name can be seen as the owner of the account in which she is

6  sending money.

 

/ /

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

26.     In the messages to the below left, PORTER tells JF that she has multiple dates in quick succession that he has arranged for her. Afterward, he asks her how she is feeling. In the messages to the below right, JF tells PORTER she feels like "shi."

 

27.     Following, she explains that she has cramps as seen below [note: during the interview she explained that her menstrual cycle had begun during this time.] However, she is not allowed to get treatment until after completing additional commercial sex acts. He emphasizes his expectation for continual engagement in

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

commercial sex by telling her he wants her to engage in commercial sex for 30 days straight:



28.    The above is a short synopsis of JF and PORTER's text message conversation. There are several messages exchanged between and/or after the above screenshots.

29.    An Instagram direct message conversation between JF and PORTER was also located within the extraction contents. The first messages begin on Thursday April

6th, 2023 and continue through 3:12 PM on April 9th. Of significance, the two are initially conversing where it is clear they know one another. On April 9th at 12:20PM, about 40 minutes prior to the assault on JF, PORTER tells JF, "U puttin yoself in a bad situation." At 3:12PM, JF tells PORTER, "IMMA MAKE SURE YO BITCH GET BEAT TFC UP LIKE YALL BEAT ME UP." Based on the timing and context of the assault, this exchange appears to be JF threatening retaliation for the assault by PORTER and Kash. PORTER responds, "Wrong person" seemingly claiming ignorance of the matter.

30.     The extraction of JF's cell phone also contained a Cash App account for JF that had transactions with "Deondre Porter" using an account name consistent with PORTER's known moniker. The transaction history between JF and PORTER was consistent with their messages and JF's statement that her earnings were given to PORTER.

31.     The extraction of JF's cell phone contained an exchange between JF and the phone number JF reported as belonging to Kash (213-408-2461). In these messages, Kash is directing JF to share her location.[13] JF is then communicating with Kash about presumably a sex buyer not wanting to pay her for the commercial sex acts up front, as is typical in this type of encounter. Lastly, Kash is once again wanting to know JF's whereabouts.

//
//
//
//
//

---

[13] Based on my training and experience, it is common for the trafficker to track the location of a prostitute under their control; this role may also be given to the bottom to assist in managing the prostitute under the trafficker's control.

1
2
3
4
5
6
7
8
9
10
11
12



13    32.    On April 10th, TFO Dierdorff and Wiener followed up with JF. During this

14 contact, additional photographs were taken of JF's injuries to her face, neck and knee.

15 In the photographs, JF has visible bleeding in her eyes, extensive bruising under eyes,

16 apparent abrasions to the side of her face, strangulation marks on her neck, and large

17 scrapes on her knee.

18    33.    JF was asked to identify which messages in her phone were between her

19 and PORTER; she pointed to the messages with phone number 442-340-5961. JF was

20 also asked to identify which messages in her phone were between her and Kash; she

21 pointed to the messages with phone number 213-408-2461. When asked about the

22 messages exchanged with Kash as seen above, JF explained that Kash was in essence

23 trying to get JF's location to bring JF back under PORTER's control.

24                    COMMERCIAL SEX ADS

25    34.    Using a law enforcement program that aggregates commercial sex ads

26 from sites known for prostitution, a search was conducted for PORTER's phone number

27 (442-340-5961) and yielded ads depicting JF and advertising her for a two-girl special

28

AFFIDAVIT IN SUPPORT OF APPLICATION                    -17-
FOR SEARCH WARRANT

(commercial sex act with two prostituted persons) in San Diego between April 7th and April 9th. The ad is pictured below but edited to remove explicit photos. As seen below, PORTER's phone number is listed in the ad as well as JF's nickname of "Dyamond." In addition, based on training and experience, TFOs believe this to be a prostitution ad based on the language including the use of the phrase "incalls and outcalls."



/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

35.     Similarly, when searching by PORTER's number, ads were located depicting who TFOs believe to be Kash. Those ads were also posted in San Diego on April 9th, as seen below. The ad has been edited to remove explicit photos. TFOs believe this to be Kash since, based on JF's statement, only the three of them were in San Diego together during this time, and the nickname listed in the ad is "Kashh".



/ /

/ /

/ /

/ /

/ /

/ /

/ /

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

**1**

**2**

**3**

36.     Ads for Kash listing her own phone number (213-408-2461) were also located. The ads were posted between April 7th and April 9th, in San Diego, and list the same name of "Kashh."

**4**

**5**

**6**

**7**

**8**

**9**

**10**

**11**

**12**

**13**

**14**

**15**

**16**

**17**

**18**



**19**

**20**

**21**

37.     Uniquely, in the ads of JF listing PORTER's phone number and the ad of Kash listing Kash's phone number, following their nickname is the same emoji. This emoji is not in the ad of Kash listing PORTER's phone number.

**22**

HOTEL ROOMS

**23**

**24**

**25**

**26**

**27**

38.     In messages exchanged between JF and PORTER, PORTER sends JF the address to their hotel room, 15822 Mojave Drive, Victorville, CA 92394. A Google search for this address linked it to the Economy Inn. A Google search for the Economy Inn's rooms yielded the below photo showing the bedding used (below left). In JF's statement, she explained that when she first arrived at the hotel room in Victorville,

**28**

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

1   Kash was there with another female who left shortly after. From a review of the ads

2   posted under Kash's phone number, there is an ad with a photo depicting who TFOs

3   believe to be Kash and the unknown female. The bedding is the same as the photo on

4   the left. The ad was posted on April 5th, the same day that JF and PORTER began

5   messaging one another.

6
7
8    
9
10
11
12

13      39.     On April 11th, I went to the Economy Inn in Victorville and located a

14   record that PORTER was registered to room 204 from April 2nd to April 6th; the hotel

15   had a copy of PORTER's driver's license on record with the registry. The front desk

16   manager recognized PORTER and said he was staying at the hotel with PORTER's

17   "girlfriend" who was registered to room 203. Records for room 203 showed it was

18   registered to L███ E████ from April 2nd to April 3rd. The hotel had a copy of L.E.'s

19   driver's license on record with registry. TFOs compared the photo of L.E. to photos in

20   the ads of Kash and could not conclusively say they are one in the same person.

21   Therefore, on April 12th, a TFO assigned to the Orange County Human Trafficking Task

22   Force showed JF a photo of L.E. JF believed L.E.'s complexion was too light to be

23   Kash.

24      40.     On April 12th, TFOs went to the Motel 6 Downtown San Diego location

25   and obtained registry information. The front desk manager provided a registration for

26   room 320 in PORTER's name, providing phone number 442-340-5961. PORTER

27   checked in on April 7th at about 3:00PM and checked out on April 8th, at about 1:00PM.

28

PORTER's stay at the hotel was abruptly ended due to hotel staff discovering he had two unregistered guests (females) at the room with him and the occupants being smoked in. As a result he was asked to leave the premises. The surveillance footage reviewed shows PORTER, JF, and an unknown female enter and exit the room on multiple occasions. There was also observed footage of the vehicle in which PORTER arrived at the hotel in, a white 4-door sedan, consistent with the make and model of PORTER's white BMW. Motel 6 staff did not note the make/model/plate of the vehicle.

SURVEILLANCE FOOTAGE

41.     On April 12th, 7-Eleven corporate sent TFO Buchholtz surveillance footage of their parking lot. The following is a synopsis from a review of that footage. At about 1:03 p.m., a white BMW matching the description of PORTER's vehicle enters the frame and stops in the driveway of the parking lot as though it is entering the roadway on Robinson Avenue. The vehicle's license plate cannot be read from the video. The rear driver's side passenger door opens and clothing/belongings are thrown out of the vehicle as the vehicle continues to move towards the roadway. The vehicle leaves the frame of the video. A short time later, JF can be seen entering the frame from the direction that the vehicle can be seen exiting the frame. She appears to be quickly moving away from the area of the vehicle and pulling up her top. None of the other camera angles captured JF exiting the vehicle. Additionally, due to the dark tint of the windows, the occupants cannot be seen.

42.     On April 12, TFO Buchholtz received surveillance footage from Robinson Plaza, a shopping center located along Robinson Avenue and Fourth Avenue. In the footage, a white BMW matching the description of PORTER's vehicle is seen driving into the 7-Eleven lot and coming to a stop. A male exits from the driver's seat, opens the rear driver's side door, and begins making quick movements with his arms consistent with a striking motion. The male then gets back into the driver's seat and the vehicle pulls out onto Robinson Avenue. As the vehicle exits onto Robinson Avenue, a

1    figure consistent with JF's build and description is ejected out of the same rear driver's

2    side door. The ejected passenger appears to land on their back near the vehicle's rear

3    driver's side tire. The vehicle then continues down Robinson Avenue with the rear

4    driver's side door still open. Multiple pedestrians in the vicinity can then be seen

5    assisting the ejected passenger.

6                            APRIL 17, 2023 ENCOUNTER

7        43.    On April 17, 2023, SDHTTF members developed information about the

8    whereabouts of PORTER and Kash. PORTER and Kash were subsequently stopped

9    after they exited a motel parking lot in San Bernardino, CA. Kash was then identified

10   as Aaliyah White (WHITE), date of birth ███████. WHITE's appearance matched

11   that of the individual depicted in the Megapersonals ads advertising commercial sex

12   services under the name "Kashh", utilizing both PORTER's 442-340-5961 phone

13   number and Kash's 213-408-2461 phone number.

14                     IDENTIFICATION OF SUBJECT ACCOUNTS

15       44.    PORTER and WHITE were stopped while in PORTER's white BMW

16   bearing CA/9DOC085. PORTER was in the driver's seat and WHITE was in the front

17   passenger's seat. After PORTER and WHITE exited the vehicle, there was one cell

18   phone on the driver's seat and one cell phone on the front passenger's seat.  At this point

19   TFOs called the numbers associated with both Target Devices.  When TFOs called 442-

20   340-5961, the cell phone on the driver's seat began to ring confirming its association

21   with **Subject Account 1**. When TFOs called 213-408-2461, the cell phone on the front

22   passenger's seat began to ring confirming its association with **Subject Account 2**. Per

23   open source records, **Subject Account 1** is serviced by T-Mobile and **Subject Account

24   2** is serviced by Verizon Wireless.

25       45.    TFOs now seek to obtain the location and toll data for the subject accounts

26   from April 5, 2023 through April 10, 2023 as evidence of the illicit commercial sex

27   activities described by JF.

28   AFFIDAVIT IN SUPPORT OF APPLICATION             -23-
     FOR SEARCH WARRANT

46.     Based on my training and experience, and my consultation with other law enforcement officers, I am aware that T-Mobile and Verizon Wireless routinely collect and store data for the electronic communication accounts to which it and other providers issue telephone numbers.   The data includes: (i) subscribers' contact and billing information; (ii) detailed information concerning subscribers' incoming and outgoing telephone calls; (iii) detailed information concerning subscribers' outgoing direct calls, text message, and SMS messages; and (iv) detailed information concerning cell-site geo-location data.

47.     In particular, I know that cell phones connect to a provider's network through cell towers or cell sites. The particular tower or site may change as a phone moves from one location to another. Providers automatically record and retain this connection data as part of the subject account. Records and data identifying the towers or sites to which a phone connected therefore tend to identify the phone's and phone user's location at particular times.

a.     I also know that different providers use the speed with which signals travel between cell phones and cell towers ("per call measurement data," or "PCMD"), as well as other data, to better calculate and record the location of phones accessing their networks.   Different providers may use different terminology to describe PCMD. For example, AT&T has referred to the resulting location information as "NELOS" data; Verizon, as "Real Time Tool" or "RTT" data; Sprint, as PCMD; and T-Mobile, as "timing advance" data.

48.     This application requests such per call measurement data (by whatever name the provider uses) for the subject accounts for the following date and time range: April 5, 2023, 12:01 a.m. UTC through April 10, 2023 11:59 p.m. UTC. During this time period, the subscriber for the subject account is believed to have been located in the vicinity of San Diego County, California

AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT                    -24-

49.     Given these facts, I seek a warrant to search the subject accounts for the records and information in Attachment B-1 and B-2.

<u>PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE</u>

50.     The United States is unaware at this time of other attempts by the U.S. government to obtain this data by other means.

_____

Aron Marcellus
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me this 25th day of April 2023.

_____

Honorable William V. Gallo
United States Magistrate Judge

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-25-

<u>ATTACHMENT A-2</u>

Verizon Wireless hosts the electronic communication account associated with the telephone number 213-408-2461 that is the subject of this search warrant and search warrant application (**Subject Account 2**).

Verizon Wireless is an electronic communication service provider whose primary computer information systems and other electronic communications and storage systems, records, and data are located at 180 Washington Valley Road, Bedminster, New Jersey 07921.

<u>ATTACHMENT B-2</u>

I.    Service of Warrant

The officer executing the warrant shall permit the Provider in Attachment A-2, as custodian of the electronic files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II.    Items to be Seized

Agents shall seize the following records, data, and information covering April 5, 2023 through April 10, 2023 and maintained by the Provider for **Subject Account 2** identified in Attachment A-2:

a.   Subscriber information, including:
    i.    Names;
    ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
    iii.  Local and long distance telephone connection records;
    iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
    v.    Length of service (including start date) and types of service utilized;
    vi.   Telephone or instrument numbers, including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
    vii.  Other subscriber numbers or identities; and
    viii. Means and source of payment (including any credit card or bank account number) and billing records.

b.   Records and other information about past wire or electronic communications sent or received by **Subject Account 2**, including:

    i.  the date and time of the communication;

   ii.  the method of the communication;

  iii.  the source and destination of the communication, such as the source and destination telephone numbers (call detail records), email addresses, or IP addresses; and

  iv.  Cell site locations and sectors for all outgoing and incoming voice, SMS, MMS, and Data communications; and

   v.  All available PCMD reports, to include "Real Time Tool" or "RTT" data, for April 5, 2023, 12:01 a.m. UTC through April 10, 2023 11:59 p.m. UTC.

which are evidence of violations of 18 U.S.C. §§ 1591 and 2422 (sex trafficking by force, fraud, and coercion and coercion and enticement of a minor to engage in prostitution, respectively).